1    Robert C. Moest, Of Counsel, SBN 62166
2    **THE BROWN LAW FIRM, P.C.**
     2530 Wilshire Boulevard, Second Floor
3    Santa Monica, California 90403
     Telephone: (310) 915-6628
4    Facsimile: (310) 915-9897
     Email: RMoest@aol.com

5    *Counsel for Plaintiff*

6

7

8            **IN THE UNITED STATES DISTRICT COURT**
             **NORTHERN DISTRICT OF CALIFORNIA**
9

10   RAK JOON CHOI, derivatively on behalf
     of CHEGG, INC.,
11
                                              Case No.:
12           Plaintiff,

13           v.

14                                            DEMAND FOR JURY TRIAL
     DANIEL L. ROSENSWEIG, ANDREW.
15   J. BROWN, NATHAN SCHULTZ,
     JOHN P. FILLMORE, ROBIN
16   TOMASELLO, RICHARD SARNOFF,
     SARAH BOND, RENEE BUDIG, PAUL
17   LeBLANC, MARNE LEVINE, TED
     SCHLEIN, MELANIE WHELAN, and
18   JOHN YORK

19           Defendants,

20
             and
21

22   CHEGG, INC.,

23           Nominal Defendant.

24

25           **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

26

27

28

1

2

**INTRODUCTION**

3

Plaintiff Rak Joon Choi ("Plaintiff"), by Plaintiff's undersigned attorneys,

4
derivatively and on behalf of nominal defendant Chegg, Inc. ("Chegg" or the "Company"),

5
files this Verified Shareholder Derivative Complaint against defendants Daniel L.

6
Rosensweig ("Rosensweig"), Andrew. J. Brown ("Brown"), Nathan Schultz ("Schultz"),

7
John P. Fillmore ("Fillmore"), Robin Tomasello ("Tomasello"), Richard Sarnoff

8
("Sarnoff"), Sarah Bond ("Bond"), Renee Budig ("Budig"), Paul LeBlanc ("LeBlanc"),

9
Marne Levine ("Levine"), Ted Schlein ("Schlein"), Melanie Whelan ("Whelan"), and John

10
York ("York") (collectively, the "Individual Defendants," and together with Chegg, the

11
"Defendants") for breaches of their fiduciary duties as directors and/or officers of Chegg,

12
unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets,

13
against Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan,

14
and York for violations of Section 14(a) of the Securities Exchange Act of 1934 (the

15
"Exchange Act"), and against Defendants Rosensweig, Brown, Schultz, Fillmore,

16
Tomasello, and Sarnoff for contribution under Sections 10(b) and 21D of the Exchange

17
Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the

18
following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and

19
information and belief as to all other matters, based upon, *inter alia*, the investigation

20
conducted by and through Plaintiff's attorneys, which included, among other things, a

21
review of the Defendants' public documents, conference calls and announcements made

22
by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire

23
and press releases published by and regarding Chegg, legal filings, news reports, securities

24
analysts' reports and advisories about the Company, and information readily obtainable on

25
the Internet. Plaintiff believes that substantial evidentiary support will exist for the

26
allegations set forth herein after a reasonable opportunity for discovery.

27

**NATURE OF THE ACTION**

28

1

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Chegg's directors and officers from May 5, 2020 through November 1, 2021 (the "Relevant Period").

2.     Chegg is a Delaware corporation based in California. Chegg provides online educations tools and services, such as tutoring and other digital learning tools, as well as physical educational resources, such as textbook rentals, to students who pay a subscription fee to the Company.

3.     Beginning in 2020, due to the onset of the Covid-19 pandemic and temporary shift to nearly exclusive online learning in educational settings ranging from elementary school to graduate school, Chegg experienced a surge in subscribers, and thus revenue.

4.     Chegg's online platform was designed, *inter alia*, to help students cheat on exams and other assignments. The shift to online learning, including the online administration of exams and other assignments previously administered in person, created new opportunities for students using Chegg's platform to cheat. During and prior to the Relevant Period, the Individual Defendants enabled the Company to monetize off  its platform's capacity to assist in academic cheating, including by providing Chegg users answer sets to copyrighted questions produced by textbook manufacturers, like Pearson Education, Inc. ("Pearson"), without permission (the "Copyright Infringement Misconduct") (collectively, the "Cheating Misconduct").

5.     Despite the contextualized growth, Chegg did not acknowledge that the increase in subscribers and revenue was the result of the Cheating Misconduct coupled with the temporary prevalence of online learning caused by Covid-19. Relatedly, Chegg failed to acknowledge that once students returned to physical classrooms, and the opportunities to use Chegg's services to cheat diminished, its subscribers and revenue would foreseeably decline.

6.     Instead, throughout the Relevant Period, the Individual Defendants made, and/or caused the Company to make, false and misleading statements and omissions of

material fact that attributed Chegg's recent growth to other, less objectionable factors such as Chegg's "strong brand and momentum" or its "unique position to impact the future of the higher education ecosystem." The Individual Defendants caused Chegg to posture as if these factors, rather than its facilitation of cheating made even easier by Covid-19, would cause the Company "to continue to grow and take advantage of the ever-expanding opportunities in the learner economy."

7.     The truth began to emerge in December 2020, when multiple news outlets reported that officials at Texas A&M University ("Texas A&M") discovered that students were using Chegg to cheat on their remote exams. This included copying and pasting answers made available to Chegg users from an online repository. Texas A&M officials found that, using Chegg, some students were able to complete exams so quickly that it was not possible for them to have been reading the questions.

8.     The truth continued to emerge on September 13, 2021, when Pearson filed suit against Chegg in the United States District Court for the District of New Jersey (the "Pearson Action"), revealing that Chegg engaged in the Copyright Infringement Misconduct by making answer sets to Pearson's copyrighted questions available to Chegg users.

9.     The truth fully emerged on November 1, 2021, after the market had closed, when Chegg announced, in a press release and in a Form 10-Q filed with the SEC, its financial results for the quarter ended September 30, 2021—i.e., a period which included the start of the first academic semester since the onset of Covid-19 where remote learning had been significantly curtailed. Chegg revealed that it had fewer subscribers than expected, that key revenue metrics had decelerated their growth or even contracted, and that the Company would not be issuing guidance for the 2022 fiscal year. Moreover, Defendant Rosensweig acknowledged that this dramatic deceleration in the Company's growth was known internally since at least September 2021.

10.    On this news, the price of the Company's common stock fell nearly 50%, from

closing at $62.76 per share on November 1, 2021, to close on November 2, 2021 at $32.12 per share.

11.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing or permitting the Company to engage in the Cheating Misconduct and the Copyright Infringement Misconduct.

12.     Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Chegg's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Chegg was engaged in the Cheating Misconduct and the Copyright Infringement Misconduct; (2) Chegg's facilitation of cheating made easier by remote learning caused the Company to experience an increase in subscribers and revenue, rather than the factors the Company publicly represented; (3) as such, once in-person learning returned, the Company would not continue to enjoy a surge in subscriptions and revenue; (4) due to the foregoing, the Company overstated its potential for growth throughout the Relevant Period; and (5) the Company failed to maintain internal controls. As a result of the foregoing, Chegg's public statements were materially false and misleading at all relevant times.

13.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

14.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

15.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to undertake a secondary public offering of its common stock in February 2021, while the Company's stock was still trading at

Verified Shareholder Derivative Complaint

artificially inflated prices due to the false and misleading statements at issue. Chegg and Defendant Rosensweig sold shares for collective proceeds of over $1 billion, subjecting the Company to liability for violations of the Exchange Act and enriching Defendant Rosensweig to the tune of approximately $29.9 million.

16.    Moreover, six of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales of Company common stock at artificially inflated prices, obtaining collective proceeds of over $91.8 million.

17.    In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), its President of Learning Services, its President of Chegg Skills, its former Principal Accounting Officer, and its Co-Chairperson to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"),[1] and has further subjected the Company to the Pearson Action, the need to remedy the Cheating Misconduct and the Copyright Infringement Misconduct, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

18.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendant Rosensweig's and Defendant Sarnoff's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent

---

[1] Defendant Sarnoff, who serves as Chegg's Co-Chairperson, is named as a defendant in the Securities Class Action complaint's "Parties" section, though he is omitted from the complaint's caption.

directors, a majority of Chegg's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. §§ 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

20.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

21.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and Chegg is headquartered in this District.

## PARTIES

### Plaintiff

24.    Plaintiff is a current shareholder of Chegg common stock. Plaintiff has continuously held Chegg common stock at all relevant times.

### Nominal Defendant Chegg

25.    Chegg is a Delaware corporation with its principal executive offices located at 3990 Freedom Circle, Santa Clara, CA 95054. Chegg's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "CHGG."

**Defendant Rosensweig**

26.     Defendant Rosensweig has served as the Company's CEO and President since February 2010, and as Co-Chairperson since July 2018. Previously, from March 2010 to July 2018, Defendant Rosensweig served as Chairperson of the Board. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 16, 2021 (the "2021 Proxy Statement"), as April 5, 2021, Defendant Rosensweig beneficially owned 1,477,605 shares of the Company's common stock, representing 1.0% of the Company's total outstanding common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 5, 2021 was $89.02, Defendant Rosensweig beneficially owned approximately $131.5 million worth of Chegg stock.

27.     For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Rosensweig received $10,381,080 in total compensation from the Company. This included $1,000,000 in salary, $9,374,954 in stock awards, and $6,126 in all other compensation.

28.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Rosensweig made the following sales of company stock at artificially inflated prices:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| May 14, 2020 | 28,000 | $63.81 | $1,786,680 |
| June 29, 2020 | 28,000 | $64.84 | $1,815,520 |
| July 7, 2020 | 28,000 | $70.83 | $1,983,240 |
| August 5, 2020 | 28,000 | $84.61 | $2,369,080 |
| September 22, 2020 | 28,000 | $66.26 | $1,855,280 |
| October 12, 2020 | 28,000 | $82.24 | $2,302,720 |
| November 19, 2020 | 28,000 | $70.64 | $1,977,920 |
| December 11, 2020 | 28,000 | $81.33 | $2,277,240 |

| January 7, 2021 | 28,000 | $91.12 | $2,551,276 |
| February 22, 2021 | 300,000 | $99.55 | $29,865,600 |

Thus, in total, before the fraud was exposed, he sold 552,000 shares of Company common stock at artificially inflated prices on inside information, for which he received approximately $48.8 million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

29.    The 2021 Proxy Statement stated the following regarding Defendant Rosensweig:

*Dan Rosensweig* has served as our President and Chief Executive Officer since February 2010, as Co-Chairperson of our Board of Directors since July 2018, and served as the Chairperson of our Board of Directors from March 2010 to July 2018. From 2009 to 2010, Mr. Rosensweig served as President and Chief Executive Officer of RedOctane, a business unit of Activision Publishing, Inc. and developer, publisher, and distributor of *Guitar Hero*. From 2007 to 2009, Mr. Rosensweig was an Operating Principal at the Quadrangle Group, a private investment firm. From 2002 to 2009, Mr. Rosensweig served as Chief Operating Officer of Yahoo! Inc., an internet content and service provider. Prior to serving at Yahoo!, Mr. Rosensweig served as the President of CNET Networks and prior to that as Chief Executive Officer and President of ZDNet, until it was acquired by CNET Networks. Mr. Rosensweig currently serves on the board of directors of Adobe Systems Incorporated. Mr. Rosensweig holds a B.A. in Political Science from Hobart and William Smith Colleges. We believe that Mr. Rosensweig should continue to serve on our Board of Directors due to the perspective and experience he brings as our Chief Executive Officer and his extensive experience with high-growth consumer internet and media companies.

**Defendant Brown**

30.    Defendant Brown has served as the Company's CFO since October 2011. According to the 2021 Proxy Statement, as of April 5, 2021, Defendant Brown beneficially owned 48,736 shares of the Company's common stock. Given that the price per share of

the Company's common stock at the close of trading on April 5, 2021 was $89.02, Defendant Brown owned approximately $4.3 million worth of Chegg stock.

31.    For the 2020 Fiscal Year, Defendant Brown received $5,033,556 in total compensation from the Company. This included $652,083 in salary, $4,374,973 in stock awards, and $6,500 in all other compensation.

32.    The 2021 Proxy Statement stated the following about Defendant Brown:

*Andrew Brown* has served as our Chief Financial Officer since October 2011. From 2004 to 2009, Mr. Brown served as the Chief Financial Officer of Palm, Inc., a smartphone provider. Mr. Brown was semi-retired following his departure from Palm before he joined us. Prior to serving at Palm, Mr. Brown served as the Chief Financial Officer of Pillar Data Systems, Inc., a computer data storage company, Legato Systems, Inc., a storage management company subsequently acquired by Dell EMC (formerly EMC Corporation), and ADPT Corporation (formerly Adaptec, Inc.). Mr. Brown also serves on the business school advisory board at Eastern Illinois University. Mr. Brown holds a B.S. in accounting from Eastern Illinois University.

**Defendant Schultz**

33.    Defendant Schultz has served as the Company's President of Learning Services since December 2018. Previously, Defendant Schultz served as the Company's Chief Learning Officer from June 2014 to December 2018, Chief Content Officer from May 2012 to June 2014, Vice President of Content Management from 2010 to May 2012, and as Director of Textbook Strategy from 2008 to 2010. According to the 2021 Proxy Statement, as April 5, 2021, Defendant Schultz beneficially owned 153,388 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2021 was $89.02, Defendant Schultz beneficially owned approximately $13.7 million worth of Chegg stock.

34.    For the 2020 Fiscal Year, Defendant Schultz received $5,031,931 in total compensation from the Company. This included $652,083 in salary, $4,374,973 in stock awards, and $4,875 in all other compensation.

35.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Schultz made the following sales of company stock at artificially inflated prices:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| May 5, 2020 | 47,376 | $60.00 | $2,842,560 |
| June 22, 2020 | 35,083 | $70.19 | $2,462,475 |
| July 31, 2020 | 82,459 | $80.34 | $6,624,756 |
| December 21, 2020 | 82,458 | $90.20 | $7,437,711 |
| April 23, 2021 | 30,000 | $ 92.86 | $2,785,800 |
| April 26, 2021 | 30,000 | $95.26 | $2,857,800 |

Thus, in total, before the fraud was exposed, he sold 307,376 shares of Company common stock at artificially inflated prices on inside information, for which he received approximately $25.0 million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

36.     The 2021 Proxy Statement stated the following regarding Defendant Schultz:

*Nathan Schultz* has served as our President of Learning Services since December 2018 and previously served as our Chief Learning Officer from June 2014 until December 2018, our Chief Content Officer from May 2012 until June 2014, our Vice President of Content Management from 2010 to May 2012 and our Director of Textbook Strategy from 2008 to 2010. Prior to joining us, Mr. Schultz served in various management positions at R.R. Bowker LLC, a provider of bibliographic information and management solutions; Monument Information Resource, a marketing intelligence resource acquired by R.R. Bowker; Pearson Education, an education publishing and assessment service; and Jones & Bartlett Learning LLC, a division of Ascend Learning Company and provider of education solutions. Mr. Schultz holds a B.A. in History from Elon University.

**Defendant Fillmore**

37.     Defendant Fillmore has served as the President of Chegg Skills since September 2020. Previously, he served as the Company's Chief Business Officer from December 2018 to September 2020, its Chief of Business Operations from October 2015 to December 2018, and as Chegg's Business Leader for Required Materials from June 2013 to October 2015. According to the 2021 Proxy Statement, as of April 5, 2021, Defendant Fillmore beneficially owned 74,985 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2021 was $89.02, Defendant Fillmore owned approximately $6.7 million worth of Chegg stock.

38.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Fillmore made the following sales of company stock at artificially inflated prices:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| May 18, 2020 | 49,442 | $64.85 | $3,206,313 |
| June 3, 2020 | 1,321 | $62.30 | $82,298 |
| September 2, 2020 | 1,321 | $77.73 | $102,681 |
| December 3, 2020 | 1,321 | $75.55 | $99,801 |
| March 3, 2021 | 51,505 | $92.25 | $4,751,336 |
| April 13, 2021 | 19,714 | $90.34 | $1,780,962 |

Thus, in total, before the fraud was exposed, he sold 124,624 shares of Company common stock at artificially inflated prices on inside information, for which he received approximately $10.0 million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

39.    For the 2020 Fiscal Year, Defendant Fillmore received $3,556,915 in total compensation from the Company. This included $552,083 in salary, $2,999,957 in stock awards, and $4,875 in all other compensation.

40.    The 2021 Proxy Statement stated the following about Defendant Fillmore:

*John Fillmore* has served as our President of Chegg Skills since September 2020 and previously served as our Chief Business Officer from December 2018 until September 2020, our Chief of Business Operations from October 2015 to December 2018 and our Business Leader for Required Materials from June 2013 to October 2015. Prior to Chegg, Mr. Fillmore's experience included service at Bain & Company, a management consulting firm, and as Chief Deputy Director for the Office of Planning and Research under then-California Governor Arnold Schwarzenegger, where he focused on education and economic development. Mr. Fillmore holds a B.S. from the University of Oregon Robert D. Clark Honors College and an M.B.A. from Harvard Business School.

**Defendant Tomasello**

41.    Defendant Tomasello served as the Company's Vice President, Corporate Controller, Assistant Treasurer, and Principal Accounting Officer from January 2012 until November 15, 2021, when she resigned.

42.    During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Tomasello made the following sale of company stock at artificially inflated prices:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| November 20, 2020 | 32,016 | $71.45 | $2,287,543 |

Her insider sale made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrates her motive in facilitating and participating in the scheme.

**Defendant Sarnoff**

43.     Defendant Sarnoff has served as Co-Chairperson of the Board since July 2018, and as a Company director since August 2012. He is also a member of the Audit Committee. According to the 2021 Proxy Statement, as of April 5, 2021, Defendant Sarnoff beneficially owned 202,700 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2021 was $89.02, Defendant Sarnoff owned approximately $18.0 million worth of Chegg stock.

44.     For the 2020 Fiscal Year, Defendant Sarnoff received $399,919 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $349,919 in restricted stock unit ("RSU") awards.

45.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Sarnoff made the following sale of company stock at artificially inflated prices:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| May 13, 2020 | 66,666 | $65.09 | $4,339,289 |

His insider sale made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

46.     The 2021 Proxy Statement stated the following about Defendant Sarnoff:

*Richard Sarnoff* has served on our Board of Directors since August 2012 and as a Co-Chairperson of our Board of Directors since July 2018. Since July 2014, Mr. Sarnoff has served as the Managing Director and Head of the Media & Communications industry team for the Private Equity platform of Kohlberg Kravis Roberts & Co. L.P., a private equity firm, and since January 2018 has served as Partner and Chairman of that team. From 2012 to 2014, Mr. Sarnoff was a Senior Adviser to Kohlberg Kravis Roberts & Co. L.P. Prior to that role, Mr. Sarnoff was employed by Bertelsmann AG, a diversified media and services company, where he served as the Co-Chairman of Bertelsmann, Inc., from 2008 to 2011, the President of Bertelsmann Digital Media Investments from 2006 to 2011, and the Executive Vice President and Chief Financial

Officer of Random House, a subsidiary of Bertelsmann, from 1998 to 2006. Mr. Sarnoff also served as a member of the supervisory board of Bertelsmann from 2002 to 2008 and served as a member of the Board of Directors of The Princeton Review from 2000 to 2009, of Audible Inc. from 2001 to 2008, and of Amdocs Limited from 2009 to 2011. Mr. Sarnoff currently serves on the Board of Directors of several privately held companies. Mr. Sarnoff holds a B.A. in Art and Archeology from Princeton University and an M.B.A. from Harvard Business School. We believe that Mr. Sarnoff should continue to serve on our Board of Directors due to his extensive experience serving in senior leadership roles in media and digital technology companies.

**Defendant Bond**

47.    Defendant Bond has served as a Company director since December 2020. She is also a member of the Compensation Committee. According to the 2021 Proxy Statement, as of April 5, 2021, Defendant Bond beneficially owned 203 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2021 was $89.02, Defendant Bond owned approximately $18,000 worth of Chegg stock.

48.    For the 2020 Fiscal Year, Defendant Bond received $203,942 in total compensation from the Company. This included $3,984 in fees earned or paid in cash and $199,958 in RSU awards.

49.    The 2021 Proxy Statement stated the following about Defendant Bond:

*Sarah Bond* has served on our Board of Directors since December 2020. Since June 2020, Ms. Bond has served as the Corporate Vice President, Gaming Ecosystem at Microsoft Corporation, a technology company, and from April 2017 to June 2020 Ms. Bond served as the Corporate Vice President of Gaming Partnerships and Business Development. Previously, Ms. Bond served in several senior roles at T-Mobile USA Inc., a telecommunications company, including as Senior Vice President of Emerging Businesses from August 2013 to September 2015, and Chief of Staff to the CEO from March 2011 to July 2013. Ms. Bond started her career as an Associate Partner at McKinsey & Company, a consulting firm. Ms. Bond currently serves on the Board of Directors of Zuora Inc. Ms. Bond holds a B.A. in economics from Yale University and an M.B.A. from Harvard Business School. We believe that Ms. Bond should continue to serve on our Board of Directors due to her extensive experience in leadership positions at technology companies.

**Defendant Budig**

50.     Defendant Budig has served as a Company director since November 2015. She is also the Chair of the Audit Committee. According to the 2021 Proxy Statement, as of April 5, 2021, Defendant Budig beneficially owned 70,217 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2021 was $89.02, Defendant Budig owned approximately $6.3 million worth of Chegg stock.

51.     For the 2020 Fiscal Year, Defendant Budig received $259,980 in total compensation from the Company. This included $60,000 in fees earned or paid in cash and $199,980 in RSU awards.

52.     The 2021 Proxy Statement stated the following about Defendant Budig:

*Reneé Budig* has served on our Board of Directors since November 2015. From September 2012 to January 2021, Ms. Budig served as the Executive Vice President and Chief Financial Officer of ViacomCBS Streaming, a division of ViacomCBS Inc. (formerly CBS Interactive, a division of CBS Inc.), an online content network for information and entertainment, and from 2010 to September 2012, Ms. Budig served as Chief Financial Officer of Hightail, Inc. (formerly branded YouSendIt and acquired by OpenText), a cloud service that allowed users to send, receive, digitally sign and synchronize files. From 2006 to 2010, Ms. Budig was the Vice President of Finance at Netflix, Inc., a multinational provider of on-demand Internet streaming media. Ms. Budig holds a B.S. in Business Administration from the University of California, Berkeley. We believe that Ms. Budig should continue to serve on our Board of Directors due to her extensive background in consumer technology companies and her financial expertise through her service as a Chief Financial Officer.

**Defendant LeBlanc**

53.     Defendant LeBlanc has served as a Company director since July 2019. He also serves as a member of the Governance and Sustainability Committee. According to the 2021 Proxy Statement, as of April 5, 2021, Defendant LeBlanc beneficially owned 8,537 shares of Company common stock. Given that the price per share of the Company's

common stock at the close of trading on April 5, 2021 was $89.02, Defendant LeBlanc owned approximately $760,000 worth of Chegg stock.

54.    For the 2020 Fiscal Year, Defendant LeBlanc received $249,980 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $199,980 in RSU awards.

55.    The 2021 Proxy Statement said the following about Defendant LeBlanc:

Paul LeBlanc has served on our Board of Directors since July 2019. Since 2003, Mr. LeBlanc has served as the President of Southern New Hampshire University, a private non-profit university. From 1996 to 2003, Mr. LeBlanc served as the President of Marlboro College, a private liberal arts college. Prior to Marlboro College, Mr. LeBlanc served as Director of Sixth Floor Media, a division of Houghton Mifflin Harcourt, Publishing Company. Mr. LeBlanc holds a B.A. in English from Framingham State University, a M.A. in English Language, Literature and Letters from Boston College, and a Ph.D. in Rhetoric, Composition and Technology from the University of Massachusetts, Amherst. We believe that Mr. LeBlanc should continue to serve on our Board of Directors due to his extensive experience in technological innovation in higher education.

**Defendant Levine**

56.    Defendant Levine has served as a Company director since May 2013. She is also the Chair of the Governance and Sustainability Committee and a member of the Compensation Committee. According to the 2021 Proxy Statement, as of April 5, 2021, Defendant Levine beneficially owned 153,045 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2021 was $89.02, Defendant Levine owned approximately $13.6 million worth of Chegg stock.

57.    For the 2020 Fiscal Year, Defendant Levine received $269,980 in total compensation from the Company. This included $70,000 in fees earned or paid in cash and $199,980 in RSU awards.

58.    The 2021 Proxy Statement stated the following about Defendant Levine:

*Marne Levine* has served on our Board of Directors since May 2013. Since February 2019, Ms. Levine served as the Vice President of Global Partnerships, Business and Corporate Development at Facebook, Inc., a social media company. From December 2014 to February 2019, Ms. Levine served as Chief Operating Officer of Instagram, a social media company and wholly owned subsidiary of Facebook, Inc. From 2010 to December 2014, Ms. Levine served as Vice President of Global Public Policy for Facebook, Inc. From 2009 to 2010, Ms. Levine served as Chief of Staff of the National Economic Council at the White House and Special Assistant to the President for Economic Policy. Ms. Levine holds a B.A. in Political Science and Communications from Miami University and an M.B.A. from Harvard Business School. We believe that Ms. Levine should continue to serve on our Board of Directors due to her extensive experience in the policy, communications and technology fields.

**Defendant Schlein**

59.     Defendant Schlein has served as a Company director since December 2008. He also serves as a member of both the Governance and Sustainability Committee and the Audit Committee. According to the 2021 Proxy Statement, as of April 5, 2021, Defendant Schlein beneficially owned 232,118 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2021 was $89.02, Defendant Schlein owned approximately $20.7 million worth of Chegg stock.

60.     For the 2020 Fiscal Year, Defendant Schlein received $259,980 in total compensation from the Company. This included $60,000 in fees earned or paid in cash and $199,980 in RSU awards.

61.     The 2021 Proxy Statement said the following about Defendant Schlein:

*Ted Schlein* has served on our Board of Directors since December 2008. Mr. Schlein has served as a General Partner of Kleiner Perkins, a venture capital firm, since November 1996. From 1986 to 1996, Mr. Schlein served in various executive positions at Symantec Corporation, a provider of internet security technology and business management technology solutions, including as Vice President of Enterprise Products. Mr. Schlein currently serves on the boards of directors of a number of privately held companies. Mr. Schlein holds a B.A. in Economics from the University of Pennsylvania. We believe that Mr. Schlein should continue to serve on our Board of Directors due to his extensive experience working with technology companies.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Defendant Whelan**

62.　Defendant Whelan has served as a Company director since June 2019. She is also a member of the Compensation Committee. According to the 2021 Proxy Statement, as of April 5, 2021, Defendant Whelan beneficially owned 6,582 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2021 was $89.02, Defendant Whelan owned approximately $586,000 worth of Chegg stock.

63.　For the 2020 Fiscal Year, Defendant Whelan received $249,980 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $199,980 in RSU awards.

64.　The 2021 Proxy Statement stated the following about Defendant Whelan:

*Melanie Whelan* has served on our Board of Directors since June 2019. Ms. Whelan has served as a Managing Director at Summit Partners, a private equity investment firm, since June 2020 and served as an Executive in Residence from January 2020 to June 2020. Previously, Ms. Whelan served as Chief Executive Officer of SoulCycle Inc., an indoor cycling fitness company, from June 2015 to November 2019 and as Chief Operating Officer from April 2012 until May 2015. Prior to joining SoulCycle, Ms. Whelan was Vice President of Business Development at Equinox Holdings, Inc., a luxury fitness company, from January 2007 to April 2012. Prior to Equinox, she also held leadership positions with Virgin Management, where she was on the founding team of Virgin America, and with Starwood Hotels & Resorts, a hospitality company. Ms. Whelan holds a B.A. in Engineering and Economics from Brown University. We believe that Ms. Whelan should continue to serve on our Board of Directors due to her extensive experience in business operations, international growth, and consumer marketing.

**Defendant York**

65.　Defendant York has served as a Company director since June 2013. He is also Chair of the Compensation Committee and a member of the Governance and Sustainability Committee. According to the 2021 Proxy Statement, as of April 5, 2021, Defendant York beneficially owned 105,748 shares of Company common stock. Given that the price per

share of the Company's common stock at the close of trading on April 5, 2021 was $89.02, Defendant York owned approximately $9.4 million worth of Chegg stock.

66.   For the 2020 Fiscal Year, Defendant York received $269,980 in total compensation from the Company. This included $70,000 in fees earned or paid in cash and $199,980 in RSU awards.

67.   During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant York made the following sales of company stock at artificially inflated prices:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
| --- | --- | --- | --- |
| July 1, 2020 | 10,000 | $68.04 | $680,400 |
| October 1, 2020 | 10,000 | $73.38 | $733,800 |

Thus, in total, before the fraud was exposed, he sold 20,000 shares of Company common stock at artificially inflated prices on inside information, for which he received approximately $1.4 million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

68.   The 2021 Proxy Statement stated the following about Defendant York:

*John York* has served on our Board of Directors since June 2013. Since February 2012, Mr. York has served as the Chief Executive Officer of the San Francisco 49ers, a professional football team in the National Football League, where he previously served as Team President from 2008 to February 2012 and as Vice President of Strategic Planning from 2005 to 2008. Prior to those roles, Mr. York served as a financial analyst at Guggenheim Partners. Mr. York holds a B.A. in Finance from the University of Notre Dame. We believe that Mr. York should continue to serve on our Board of Directors due to his extensive leadership experience and strong corporate development background.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

69.   By reason of their positions as officers, directors, and/or fiduciaries of Chegg and because of their ability to control the business and corporate affairs of Chegg, the

Individual Defendants owed Chegg and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Chegg in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Chegg and its shareholders so as to benefit all shareholders equally.

70.     Each director and officer of the Company owes to Chegg and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

71.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Chegg, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

72.     To discharge their duties, the officers and directors of Chegg were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

73.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Chegg, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Chegg's Board at all relevant times.

74.   As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

75.   To discharge their duties, the officers and directors of Chegg were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Chegg were required to, among other things:

(a)   ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Chegg's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)   remain informed as to how Chegg conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, such as the Cheating Misconduct and Copyright Infringement Misconduct, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)   establish and maintain systematic and accurate records and reports of the business and internal affairs of Chegg and procedures for the reporting of the business

and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Chegg's operations would comply with all applicable laws and Chegg's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

76.    Each of the Individual Defendants further owed to Chegg and the shareholders the duty of loyalty requiring that each favor Chegg's interests and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

77.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Chegg and were at all times acting within the course and scope of such agency.

78.    Because of their advisory, executive, managerial, and directorial positions with Chegg, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

79.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts

complained of herein, as well as the contents of the various public statements issued by Chegg.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

80.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

81.   The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

82.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who was a director of Chegg was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

83.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct

part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of their overall contribution to and furtherance of the wrongdoing.

84.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Chegg and was at all times acting within the course and scope of such agency.

## CHEGG'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### *Code of Conduct*

85.    The introduction to Chegg's Code of Conduct reads, in relevant part:

At Chegg, we are committed to the highest standards of business conduct in our relationships with one other, our student customers, our stockholders and our suppliers and partners. While we'll always compete hard and do our best to protect Chegg's interests, we won't cut legal or ethical corners to meet a business objective. And protecting Chegg's interests should never come at the expense of fairness to the students we serve nor to the companies with whom we do business. Integrity is at our core.

86.    The Code of Conduct's introduction continues by stating that it "applies to our Board of Directors, all Chegg employees and contractors with whom we do business."

87.    The Code of Conduct lists among the Company's values: "Integrity – be transparent candid and authentic[.]"

88.    The Code of Conduct instructs that Chegg personnel must "[a]void even the appearance of a conflict[,]" adding that:

A conflict of interest can occur when you are in a position at Chegg to influence some decision that could result in personal gain for you, your friends or your family, at the expense of Chegg, our investors or our community of users.

89.    The Code of Conduct section on "Academic Integrity" reads:

We serve a diverse academic community that operates on honesty and integrity. We seek to strengthen our nation's academic system by helping students learn, but we will not support or profit from unethical academic behavior. We will not promote plagiarism, sell pirated books, or provide materials designed to aid cheating. We do not condone piracy and will build systems to discourage our customers' unauthorized use of protected materials.

Just as we strive to grow our business with integrity, we want to support the vast majority of our customers who only want to learn with integrity and compete fairly for grades.

90.   In addition, the Code of Conduct states the following about using copyrighted material: "Chegg respects the valid intellectual property rights of other parties. Do not use, copy or distribute third party intellectual property without permission or arranging with the legal department to obtain the appropriate rights. The absence of a copyright notice does not mean that the materials are not copyrighted."

91.   Under the heading, "Obey the Law," the Code of Conduct states, in relevant part:

Chegg takes its responsibility to comply with the law seriously, and all Chegg employees and Board members are expected to know the major laws and regulations that apply to their job, and follow all applicable legal requirements and prohibitions. This includes being familiar with Chegg's Legal Compliance Policy and the subject matter specific policies that are a component of our Legal Compliance Policy. A few laws are worth calling out specifically.

• Insider trading: Insider trading is both unethical and illegal. Employees, directors and their family members are prohibited from using "inside" or material non-public information about the company, or about companies with which we do business, in connection with buying or selling Chegg stock or the stock of other companies. This prohibition includes including "tipping" others who might make an investment decision on the basis of this information. Chegg has an open culture and believes in being open and transparent with its team. Yet this openness carries with it responsibility – much of our information is confidential and cannot be shared outside the company. Using this information, including non-public information regarding our suppliers and business partners, to buy or sell stock, or passing it to others so that they can trade stock, violates not only this Code, but state and federal securities laws. It is your responsibility to familiarize yourself with Chegg's Insider Trading Policy, which lays out the procedures that you and the company will follow to avoid even the appearance of such activity.

92.   The Code of Conduct also contains a "Finance Code of Conduct" applicable to "the Chief Executive Officer, Chief Financial Officer, the controller, and any persons

performing similar functions." The Finance Code of Conduct further provides, in relevant part:

- <u>Honest and Ethical Conduct</u>: Senior financial officers owe a duty to Chegg to act and perform their duties ethically and honestly and with the highest sense of integrity. This requires an officer to avoid actual or apparent conflicts of interest between personal and professional relationships, which requires observation of both the form and the spirit of technical and ethical accounting standards.

- <u>Conflict of Interest:</u> A "conflict of interest" occurs when an individual's private interest interferes or appears to interfere with the interests of the company. Conflicts of interest are prohibited as a matter of Chegg policy, unless they have been waived by the company. In particular, a senior financial officer must never use or attempt to use his or her position at the company to obtain any improper personal benefit for himself or herself, for his or her family, or for any other person. Any senior financial officer who is aware of a conflict of interest, or is concerned that a conflict might develop, is required to promptly discuss the matter with Audit Committee of the Board of Directors or the Chief Executive Officer and the General Counsel.

- <u>Disclosure</u>: Senior financial officers are responsible for ensuring that the disclosure in the reports and documents that Chegg files with, or submits to, the Securities and Exchange Commission and in other public communications made by Chegg is full, fair, accurate, timely and understandable. Therefore, senior financial officers are required to familiarize themselves with the disclosure requirements applicable to the company as well as the business and financial operations of the company.

In addition, in the performance of their duties, senior financial officers are prohibited from knowingly misrepresenting facts. A senior financial officer will be considered to have knowingly misrepresented facts if he or she knowingly (i) makes, or permits or directs another to make, materially false or misleading entries in an entity's financial statements or records; (ii) fails to correct materially false and misleading financial statements or records; (iii) signs, or permits another to sign, a document containing materially false and misleading information; or (iv) falsely responds, or fails to respond, to specific inquiries of the company's external accountant. Any senior financial officer who is aware of a material misrepresentation or omission in Chegg's financial disclosure is required to promptly report the matter to Audit Committee of the Board of Directors or the Chief Executive Officer and the General Counsel.

Senior financial officers are responsible for adequately supervising the preparation of the financial disclosure in all reports the company is required to file. Adequate supervision includes closely reviewing and critically analyzing the financial information to be disclosed.

• Compliance: It is Chegg's policy to comply with all applicable laws, rules and regulations. It is the personal responsibility of each senior financial officer to adhere to the standards and restrictions imposed by those laws, rules and regulations, and in particular, those relating to accounting and auditing matters. Each senior financial officer is accountable for his or her compliance with this Finance Code of Conduct as well as all those under supervision to whom this Finance Code of Conduct applies.

Any senior financial officer must promptly report violations of the Finance Code of Conduct to the Audit Committee. If any senior financial officer is unsure whether a situation violates any applicable law, rule, regulation or company policy should discuss the situation with the General Counsel or the Chief Financial Officer to prevent possible problems at a later date. Failure to do so is itself a violation of this Code. To encourage officers to report any violations, Chegg will not allow retaliation for reports made in good faith.

93.     Finally, the Code of Conduct provides that: "If you are aware of a suspected or actual violation of Code standards by others, you have a responsibility to report it."

***Audit Committee Charter***

94.     The Charter of the Audit Committee of the Board of Directors of Chegg, Inc. (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

95.     Per the Audit Committee Charter, among the Audit Committee's "principal functions" are to "assist the Board in overseeing the integrity of the financial statements and accounting and financial reporting processes of the Company . . . as well as the Company's compliance with legal and regulatory requirements[.]"

96.     An additional "principal function[]" is to "oversee risk assessments and risk management pertaining to financial, accounting and tax matters of the Company."

97.     The Audit Committee Charter lists among the Audit Committee's responsibilities:

1. Review and discuss with management and the Independent Auditors the Company's quarterly results and the related earnings press release prior to distribution to the public.

2. Periodically discuss on a general basis with management the type of information to be disclosed and type of presentation to be made regarding released financial information.

\*          \*          \*

9. Discuss on a general basis the type of information to be disclosed and type of presentation to be made regarding financial information and earnings guidance to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentation to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information).

\*          \*          \*

11. Periodically discuss with the Company's principal accounting officer and principal in-house legal counsel the function of the Company's disclosure controls and procedures and any disclosure committee that may be established by the Company. Discuss with the Company's Chief Executive Officer and Chief Financial Officer their conclusions regarding the effectiveness of the Company's disclosure controls and procedures.

98.   The Individual Defendants violated Chegg's Code of Conduct by engaging in or permitting the Company to engage in the Cheating Misconduct and the Copyright Infringement Misconduct, issuing materially false and misleading statements to the investing public, and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, supporting and profiting from unethical academic behavior, failing to avoid conflicts of interest, failing to respect the intellectual property rights of others, engaging in insider trading, failing to ensure the Company's disclosures were accurate, failing to ensure the

Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law.

99.     Moreover, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in the Cheating Misconduct and the Copyright Infringement Misconduct, issuing materially false and misleading statements to the investing public, and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company' disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

100.    Chegg is a Delaware corporation based in California. Chegg offers an online learning platform, directed at high school and college students, that provides students with digital tools and other materials to assist them with their classes.

101.    Chegg offers "Chegg Services," including "Chegg Study," "Chegg Math Solver," and "Chegg Writing" that assist students with different academic areas, in exchange for a subscription fee.

102.    In the 2020 Fiscal Year, 81% of Chegg's revenue came from Chegg Services business segment and 19% came from Chegg's Required Materials business segment, which offers rental textbooks.

103.    Chegg's online learning tools, particularly its online tutoring platform that enables students to ask experts for the answers to their homework questions, have been criticized as going beyond merely helping to students to instead facilitate cheating. For example, in 2019, Citron Research wrote a short report about Chegg titled: "The Poster Child for Institutionalized Cheating."

104.    With the arrival of Covid-19, and the transition to predominantly online learning, Chegg experienced a surge in its business. In its annual report for the 2020 Fiscal Year filed with the SEC on Form 10-K on February 22, 2021, the Company disclosed that revenue in the Chegg Services segment grew 57% year-over-year in 2020, compared with 31% the prior year. Likewise, in the Required Materials segment, revenue grew 56% year-over-year in 2020, compared to 17% the prior year.

105.    In terms of subscribers, Chegg had 6.6 million subscribers by the end of 2020, compared to 3.9 million at the end of 2019 and 3.1 million at the end of 2018.

106.    This profitable surge in usage of Chegg's services and products was driven by the new cheating opportunities available to students with the prevalence of remote learning. However, rather than disclose this distasteful truth, the Individual Defendants made and caused the Company to make false and misleading statements to the investing public attributing Chegg's recent good fortunes to other, less objectionable causes.

**The Cheating Misconduct**

107.    The Company's post-Covid-19 surge in subscribers and revenue was attributable to the Company's facilitation of cheating by students.

108.    The mechanism of this cheating became clear when, no later than December 16, 2020, multiple news outlets[2] reported that officials at Texas A&M had discovered that

---

[2] *See, e.g.*, Anna Gallegos, IHEART (Dec. 17, 2020), *Hundreds of Texas A&M Students Accused of Using Chegg to Cheat*, https://www.iheart.com/content/2020-12-17-hundreds-of-texas-am-students-accused-of-using-chegg-to-cheat/ (last visited Jan. 12, 2022); ShaCamree Gowdy, CHRON (Dec. 16, 2020), *Hundreds of Students Used Chegg to Cheat During Online Exam, Texas A&M Alleges*, https://www.chron.com/news/houston-texas/education/article/Chegg-Texas-A-M-students-cheating-virtual-classes-

students were using Chegg to cheat on their remote exams—a cheating opportunity made plentiful by remote learning brought on by Covid-19.

109.    Specifically, some students were copying and pasting answers into their online exams and other assignments from a repository made available to Chegg users. Other students, if they were not under pressing time constraints, were able to post questions on Chegg's website and have a Chegg tutor answer the question, before passing off that answer as their own.

110.    According to these news reports, in early December 2021, Texas A&M officials had emailed hundreds of students regarding the discovery of cheating "on a very large scale" after Texas A&M tracking software detected that some students, using Chegg, were completing exams so quickly that it was not possible for them to have been reading the questions. The *Texas Tribune* quoted the director of the Aggie Honor System Office at Texas A&M as stating that there were "hundreds of examples" of students doing this.[3] The same *Texas Tribune* article noted that students at Georgia Tech University and Boston University had also been caught cheating using Chegg.

111.    Thus, the Individual Defendants knew, or should have known, that the surge in the Company's subscribers and revenue that coincided with the onset of Covid-19 and remote learning was attributable to the Cheating Misconduct. Despite this, the Company did not reveal the extent to which its rosy financial picture depended on the Cheating Misconduct, and how the Company's finances were certain to take a meaningful hi once remote learning, and the cheating opportunities it created, ceased.

**<u>The Copyright Infringement Misconduct</u>**

---

15808790.php (last visited Jan. 12, 2022); Kate McGee, Texas Tribune (Dec. 16, 2020), *Texas A&M Investigating "Large Scale" Cheating Case as Universities See More Academic Misconduct in Era of Online Classes*, https://www.texastribune.org/2020/12/16/texas-am-chegg-cheating/ (last visited Jan. 12, 2022).

[3] https://www.texastribune.org/2020/12/16/texas-am-chegg-cheating/ (last visited Jan. 12, 2022).

Verified Shareholder Derivative Complaint

112.   The Cheating Misconduct was made even worse by the fact that the Company was also engaged in copyright infringement in facilitating students' cheating.

113.   This would later be revealed on September 13, 2021, when Pearson initiated the Pearson Action, captioned *Pearson Education, Inc. v. Chegg, Inc.*, Case No. 2:21-cv-16866-SDW-ESK (D.N.J.), revealing that Chegg engaged in the Copyright Infringement Misconduct by making available to Chegg subscribers answer sets to Pearson's copyrighted questions. Pearson attached as an exhibit to its complaint (Pearson Action, Document 1 & 1-1) a list of 150 of its textbooks for which Chegg was engaged in copyright infringement by providing answers to hundreds of thousands of questions contained therein. Pearson's complaint further noted that Chegg had answers for questions from approximately 9,000 textbooks, meaning that its potential liability for copyright infringement across all these titles was dramatically larger than just the 150 Pearson textbooks at issue in the Pearson Action.

114.   Thus not only were Chegg's good financial fortunes following the onset of Covid-19 attributable to the Cheating Misconduct, but the Cheating Misconduct itself was in part predicated on the Company providing answers to copyrighted questions. By causing and/or permitting this, and failing to disclose it, the Individual Defendants damaged Chegg and exposed it to liability.

**False and Misleading Statements**

*May 4, 2020 Press Release*

115.   On May 4, 2020, the Company issued a press release, also attached to a From 8-K filed with the SEC the same day, announcing its financial results for the quarter ended March 31, 2020—the first quarter with Covid-19 present in the United States. The press release contained prepared remarks by Defendant Rosensweig, in which he stated, in relevant part:

> Our belief is that, in every industry, ***a crisis often accelerates the inevitable and that is what we are seeing happening now*** in higher education. The reality is students were already learning online, were under supported by their

1
2
3
4
5
6
7

schools who had diminishing budgets, so that the need for virtual learning support was already expanding. But, almost overnight, when schools around the world had to move 100% online, *that trend accelerated and has revealed the true potential and the value of what Chegg has to offer*. The numbers say it best, and what they reflect is that *students have an even greater need for high-quality, low-cost, personalized, and adaptive online education* to help them learn and master their curriculum. As we think about the lasting impact on the future of higher education globally, we see these trends continuing.

(Emphasis added.)

### August 3, 2020 Press Release

116.   On August 3, 2020, the Company issued a press release, also attached to a From 8-K filed with the SEC the same day, announcing its financial results for the quarter ended June 30, 2020. The press release contained the following prepared remarks by Defendant Rosensweig, in which he stated, in relevant part:

> *While student's lives were disrupted, the one constant was that Chegg was there to provide high-quality, expert, on-demand support from any device, in any location, which resulted in accelerated growth across our services.* Students turned to Chegg in record numbers and we experienced unprecedented engagement, with subscriber growth of 67% year-over-year, including our new Mathway subscribers, reaching a record 3.7 million students. This yielded net revenue growth of 63%, year-over-year, in Q2 alone. *To put that in perspective, we had more subscribers in Q2 of this year than we had in all of 2018.*
>
> As schools and millions of students wrestle with how best to handle a return to campus, we know that some are supporting a full in-person return, while others are offering a fully online experience, and still others are planning a hybrid version of online and offline. *Regardless of which experience a student has, Chegg will be there to support students this fall and beyond. In fact, students are increasingly turning to Chegg for support to navigate these uncertain times and we expect this trend to continue post the pandemic*, regardless of where or how someone learns, Chegg will be there for them. From day one, *Chegg was built on the inevitability that people would need to learn more often, increasingly online, and need greater support.* Long before the global pandemic, we believed the digital transition was coming and education would have to fundamentally change.

(Emphasis added.)

### October 26, 2020 Press Release

117.   On October 26, 2020, the Company issued a press release announcing, also attached to a From 8-K filed with the SEC the same day, its financial results for the quarter ended September 30, 2020. The press release contained the following prepared remarks by Defendant Rosensweig, in which he stated:

It has become apparent to us, that this terrible pandemic has only further highlighted the need for higher education to transition to a model that is more on-demand, student-centric, affordable, and does a much better job of leveraging technology to the advantage of the learner. As evident in our Q3 results, students more than ever before are relying on Chegg as they navigate their semesters, whether they are back on campus or not. And while our business continues to have an extraordinary year, more importantly, we are helping millions of students get through these uncertain times. In Q3, we saw subscriber growth of 69% year-over-year, reaching 3.7 million students in the quarter. This yielded total net revenue growth of 64%, year-over-year. *The inevitable trend towards online learning, the clear need for high-quality online support, and the momentum we are experiencing globally, gives us the confidence to raise our guidance again for 2020 and provide our initial outlook for 2021.* Andy will walk you through all of these numbers shortly, but I would like to take a moment to share with you why we believe our results will continue to perform at such a high level.

*Millions of students around the world are now asking for a better return for their education and demanding a shift to the model we always knew it would become: increasingly online, on-demand, adaptive, affordable, personalized, and tailored to the modern learner.* Chegg has been focused on these things for years so, we believe we are in the best position to not only expand academic support to students but also expand support to learners throughout their professional journey. We have tailored our efforts to reach students on different paths, including more at online schools and community colleges, and we are also seeing increasing demand for online learning support from students around the world.

Even before the global pandemic, there was a real question around the ROI of a college education and students are demanding the ability to learn faster, have their education directly connect to their career path, and accelerate their path

from learning to earning. We know that the modern student also looks very different than they once did. They are older, many have families, they are juggling work and school at the same time, so it comes as no surprise that they need more flexibility when it comes to their learning. More than ever before, like everything else in their lives - entertainment, dining, banking - they expect education to come to them, at the time that is most convenient for them, in the format that they want, at a price they can afford, and that provides a real ROI. *Chegg's online learning support platform is designed to serve the students in just this way*.

\* \* \*

What this means for Chegg is there's an overwhelming need for the services we provide, and we see that in the increased demand and engagement across all our platforms, all over the world. *And, as students rely on Chegg for more academic support, we continue to expand what we offer, more recently with the acquisition of Mathway. These expanded offerings will also increase the value proposition for Chegg Study Pack, which is why we are seeing higher than expected take rates for that offering, including internationally.*

\* \* \*

The other inevitable trend that we have identified is that students everywhere are seeking alternative, less expensive, pathways to pursue their careers. That is why we invested in Thinkful and in skills-based learning. We think our strategy of increasing the curriculum to match to the most in-demand jobs, lowering our prices, offering Income Sharing Agreements, and building in live chat support is a better model than anyone else has to offer.

And while we continue to navigate this complicated time in our history, while so many things have changed, some things remain the same. There will always be a need for students to learn new skills in order to improve their opportunities. There will always be institutional pathways, but they will now be both offline and online. There has always been a need to connect academic to professional pathways and we believe this moment in time will create a major acceleration of that trend. *That is why we built Chegg, from day one, to be an advocate for this transition in higher education and why we continue to invest in supporting anyone on their learning journey. This is why we are reinventing the model of learning to earning, with lower priced, higher quality, human support, at scale - all exclusively online.*

Verified Shareholder Derivative Complaint

(Emphasis added.)

**The Truth Begins Emerging While False and Misleading Statements Continue**

*December 2020 Texas A&M Cheating Discovery*

118.   The truth began emerging in December 2020 when, as described above, multiple news outlets reported that Texas A&M officials had discovered widespread cheating by students who were using Chegg.

119.   Despite certain aspects of the Cheating Misconduct coming to light at this time, the full extent, including the Copyright Infringement Misconduct, and the degree to which the Company's short-term increase in revenue was a product of this misconduct remained undisclosed.

*February 8, 2021 Press Release*

120.   On February 8, 2021, the Company issued a press release, also attached to a From 8-K filed with the SEC the same day, announcing its financial results for the quarter and full year ended December 31, 2020. The press release contained the following statement by Defendant Rosensweig, in relevant part:

> We are incredibly grateful that, even in the midst of the many challenges of the past year, we outperformed all expectations and were able to continue to support students, in record numbers, around the world[.] . . . ***The transition to online and hybrid learning is inevitable and, with the accelerated trends that we are seeing, we have the confidence to raise our guidance for 2021.***

(Emphasis added.)

*April 16, 2021 Proxy Statement*

121.   On April 16, 2021, the Company filed the 2021 Proxy Statement with the SEC. Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan and York solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[4]

---

[4] Plaintiff's allegations with respect to the misleading statements in the 2021 Proxy Statement are solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege,

122.   The 2021 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) elect Defendants LeBlanc, Levine, and Sarnoff to the Board; (2) approve, via non-binding advisory vote, the 2020 Fiscal Year compensation of the Company's named executive officers, including Defendants Rosensweig, Brown, Schultz, and Fillmore; and (3) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2021.

123.   The 2021 Proxy Statement stated the following regarding the performance-based portion of named executive officer compensation:

> We grant PSUs [performance-based restricted stock units] because they are linked to stockholder value creation, like RSUs [here meaning time-based restricted stock units], but are also leveraged to our financial performance and allow us to set appropriate annual goals that we believe are critical to drive long-term success. On March 1, 2020, the Compensation Committee granted PSU awards to our NEOs subject to the achievement of certain financial performance goals and conditioned on the executive officer's service up to and through the applicable multi-year, time-based vesting dates.
>
> ***These PSUs will be earned and eligible to vest contingent on the achievement of two equally weighted performance metrics: (1) fiscal year 2020 Chegg Services Revenue and (2) fiscal year 2020 adjusted EBITDA (both as defined below). These two metrics were selected because the Compensation Committee believes that Chegg Services Revenue growth and adjusted EBITDA, a non-GAAP measure of profitability, are the most important drivers of stockholder value for Chegg in 2020*** as they are primary components of our overall revenue growth and profitability***. The selection of these two measures as PSU metrics ensures our executive officers are incentivized in accordance with the long-term interests of our stockholders.*** The performance metrics and their timing are synchronized with the board-approved corporate strategic plan and associated metrics and targets.
>
> We currently use a one-year performance period (with a multi-year time-based vesting schedule) to allow us the flexibility to set appropriate annual goals to drive stockholder value given our high growth expectations and the

and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

rapidly changing nature of the industry in which we operate. Because of the potential risks to performance and motivation that are associated with improperly setting goals in a high-growth environment, the Compensation Committee has not adopted multi-year performance goals at this time but will continually monitor this topic.

(Emphasis added.)

124.   With respect to the Company's Code of Conduct, the 2021 Proxy Statement stated that: "We have adopted a Code of Business Conduct and Ethics that applies to all of our directors, officers and employees. . . . To satisfy the disclosure requirement under Item 5.05 of Form 8-K, any amendments or waivers of our Code of Business Conduct and Ethics pertaining to a member of our Board of Directors or one of our executive officers will be disclosed on our website[.]" The 2021 Proxy Statement also stated that: "Our employees are required to comply with our Code of Business Conduct and Ethics[.]"

125.   Regarding the "Board of Directors' Role in Risk Oversight," the 2021 Proxy statement said:

Our Board of Directors, as a whole, has responsibility for risk oversight, although the committees of our Board of Directors oversee and review risk areas which are particularly relevant to them. The risk oversight responsibility of our Board of Directors and its committees is supported by our management reporting processes, which are designed to provide visibility to the Board of Directors and to our personnel that are responsible for risk assessment and information management about the identification, assessment and management of critical risks and management's risk mitigation strategies. These areas of focus include, but are not limited to, competitive, economic, operational, financial (accounting, credit, liquidity and tax), legal, regulatory, compliance and reputational risks.

Each committee of the Board of Directors meets in executive session with key management personnel and representatives of outside advisers to oversee risks associated with their respective principal areas of focus. The Audit Committee reviews our major financial risk exposures and the steps management has taken to monitor and control such exposures, including our risk assessment and risk management policies and guidelines. The Governance and Sustainability Committee reviews our major legal compliance risk exposures and monitors the steps management has taken to mitigate these exposures,

including our legal risk assessment and legal risk management policies and guidelines. The Compensation Committee reviews our major compensation-related risk exposures, including consideration of whether compensation rewards and incentives encourage undue or inappropriate risk taking by our personnel, and the steps management has taken to monitor or mitigate such exposures.

126.  Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan and York caused the 2021 Proxy Statement to be false and misleading, with regard to the statements in ¶¶ 123–25 by failing to disclose that: (1) though the Company claimed that, in awarding performance-based compensation, it used certain metrics to "ensure[][Chegg's] executive officers are incentivized in accordance with the long-term interests of our stockholders[,]" the selected metrics actually rewarded the Company's officers for a short-term increase in revenue caused by a combination of the Covid-19 pandemic and the Cheating Misconduct, and that these metrics would meaningfully decline once widespread remote learning ended; (2) though the Company claimed its directors and officers adhered to the Code of Conduct and that it would disclose waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed; and (3) the Board, and its committees were not properly exercising their risk oversight functions, including their review of the risk exposures described, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board.

127.  In addition, the 2021 Proxy Statement was materially false and misleading, and failed to disclose material facts necessary to make the statement made not false and misleading, because the 2021 Proxy Statement failed to disclose, *inter alia*, that: (1) Chegg was engaged in the Cheating Misconduct and the Copyright Infringement Misconduct; (2) Chegg's facilitation of cheating made easier by remote learning caused the Company to experience an increase in subscribers and revenue, rather than the factors the Company publicly represented; (3) as such, once in-person learning returned, the Company would not continue to enjoy a surge in subscriptions and revenue; (4) due to the foregoing, the

Company overstated its potential for growth throughout the Relevant Period; and (5) the Company failed to maintain internal controls.

128.   As a result of Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan and York causing the 2021 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) elect Defendants LeBlanc, Levine, and Sarnoff to the Board, allowing them to continue or being breaching their fiduciary duties to the Company and; (2) approve, via non-binding advisory vote, the compensation of the Company's named executive officers, including Defendants Rosensweig, Brown, Schultz, and Fillmore, who were breaching their fiduciary duties to the Company.

### *May 3, 2021 Press Release*

129.   On May 3, 2021, the Company issued a press release, also attached to a From 8-K filed with the SEC the same day, announcing its financial results for the quarter ended March 31, 2021. The press release contained the following statement by Defendant Rosensweig, in relevant part: ***"We are in a unique position*** to impact the future of the higher education ecosystem[.] . . . ***Our strong brand and momentum will allow us to continue to grow and take advantage of the ever-expanding opportunities*** in the learner economy." (Emphasis added.)

### *August 9, 2021 Press Release*

130.   On August 9, 2021, the Company issued a press release, also attached to a From 8-K filed with the SEC the same day, announcing its financial results for the quarter ended June 30, 2021. The press release contained the following statement by Defendant Rosensweig, in relevant part: "It is clear, ***wherever students are learning, whether online, in the classroom, or in a hybrid model, the value of Chegg is unquestionabl****e*[.]" (Emphasis added.)

131.   The statements identified in ¶¶ 115–17, 120, and 129–30 were materially false and misleading, and failed to disclose material facts necessary to make the statements made

not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Chegg was engaged in the Cheating Misconduct and the Copyright Infringement Misconduct; (2) Chegg's facilitation of cheating made easier by remote learning caused the Company to experience an increase in subscribers and revenue, rather than the factors the Company publicly represented; (3) as such, once in-person learning returned, the Company would not continue to enjoy a surge in subscriptions and revenue; (4) due to the foregoing, the Company overstated its potential for growth throughout the Relevant Period; and (5) the Company failed to maintain internal controls. As a result of the foregoing, Chegg's public statements were materially false and misleading at all relevant times.

## The Truth Fully Emerges

132.   On September 13, 2021, Pearson initiated the Pearson Action, revealing that Chegg engaged in the Copyright Infringement Misconduct by making available to Chegg subscribers answer sets to Pearson's, and other companies', copyrighted questions.

133.   The truth finally emerged on November 1, 2021, after the market had closed, when Chegg announced, in a press release and a Form 10-Q filed with the SEC, its financial results for the quarter ended September 30, 2021—i.e., a period that included the start of the first academic semester since the onset of Covid-19 where remote learning had been significantly curtailed. In the press release and the Form 10-Q, Chegg revealed that it had fewer subscribers than expected, that key revenue metrics had decelerated or contracted, and that the Company would not be issuing guidance for the 2022 fiscal year.

134.   From the first quarter of 2021 to the second quarter of 2021, revenue growth in the Chegg Services segment declined year-over-year from 62% to 38%. In the Required Materials segment during this same time, revenue growth declined from 15% growth, year-over-year, in the first quarter 2021, to an 8% *contraction*, year-over-year, by the second quarter 2021. From the second quarter 2021 to the third quarter 2021, revenue growth in the Chegg Services segment declined further still from 38% to 23%, year-over-year.

Likewise, in the Required Materials segment, revenue continued contracting year-over-year, dropping from an 8% contraction the second quarter 2021 to a 28% contraction in the third quarter 2021. In total, from the first quarter 2021, to the second quarter 2021, to the third quarter 2021, the Company's total revenue growth, year-over-year, fell from 51% to 30% to 12%, respectively.

135.   Moreover, Defendant Rosensweig acknowledged in prepared remarks contained in the November 1, 2021 press release that, "***in late September it became clear to us that the education industry is experiencing a slowdown***[.]" (Emphasis added.)

136.   On this news, the price of the Company's common stock fell from $62.76 per share at close on November 1, 2021, to close on November 2, 2021 at $32.12 per share, a remarkable drop of $30.64 per share or nearly 50%.

### Secondary Public Offering

137.   During the period in which the Company made false and misleading statements and/or omissions, causing its share price to be artificially inflated, the Individual Defendants caused the Company to offer over 11 million additional shares to investors through a secondary public offering.

138.   According to a Form 8-K filed by the Company with the SEC on February 19, 2021, a total of 11,274,600 shares were sold in the secondary public offering (300,000 of which were Defendant Rosensweig's shares) at a price of $102.00 per share. The Company estimated that it would receive approximately $1.09 billion in net proceeds as a result.

139.   Defendant Rosensweig personally made $29,865,600 by selling his 300,000 shares in the secondary public offering at prices artificially inflated by his own false and misleading statements, demonstrating his motive for both making these statements and pursuing a secondary public offering which exposed the Company to liability for violations of the Exchange Act.

140.   The Individual Defendants' actions, in causing the Company to engage in this secondary public offering while the price of its securities was artificially inflated due to the

misconduct described herein, constituted a breach of their fiduciary duties to the Company that resulted in Defendant Rosensweig being personally enriched by the Individual Defendants', including his own, deceptions and the Company being subjected to costly litigation and potential liability in the Securities Class Action for the violations of the Exchange Act which the Individual Defendants caused it to undertake.

**Insider Sales**

141.   Defendants Rosensweig, Schultz, Fillmore, Tomasello, Sarnoff, and York made insider sales, detailed above, at prices artificially inflated by the false and misleading statements at issue for collective proceeds of $91.8 million.

142.   Those sales that occurred shortly before or after the Individual Defendants caused the Company to issue false and misleading statement contribute to an inference that these Individual Defendants knew of the falsity of the statements and were cashing in while the Company's common stock continued to trade at artificially inflated prices.

143.   For example, following the false and misleading statements issued in the May 4, 2020 press release, Defendant Shultz sold 47,376 shares of Company common stock for proceeds of about $3.2 million on May 5, 2020; Defendant Sarnoff sold 66,666 shares of Company common stock for proceeds of about $4.3 million on May 13, 2020; Defendant Rosensweig sold 28,000 shares of Company common stock for proceeds of about $1.8 million on May 14, 2020, and Defendant Fillmore sold 49,442 shares of Company common stock for proceeds of about $3.2 million on May 18, 2020.

144.   Prior to the false and misleading statements issued in the August 3, 2020 press release, Defendant Schultz sold 82,459 shares of Company common stock for proceeds of about $6.6 million on July 31, 2020. Following the false and misleading statements issued in the August 3, 2020 press release, Defendant Rosensweig sold 28,000 shares of Company common stock for proceeds of about $2.4 million on August 5, 2020.

145.    Prior to the false and misleading statements issued in the October 26, 2020 press release, Defendant Rosensweig sold 28,000 shares of Company common stock for proceeds of about $2.3 million on October 12, 2020.

146.    As previously mentioned, following the false and misleading statements issued in the February 8, 2021 press release, Defendant Rosensweig sold 300,000 shares of Company common stock in the secondary public offering for proceeds of about $29.9 million on February 22, 2021. Shortly thereafter, on March 3, 2021, Defendant Fillmore sold 51,505 shares of Company common stock for proceeds of about $4.8 million.

147.    Just before the false and misleading statements contained in the 2021 Proxy Statement were filed with the SEC on April 16, 2021, Defendant Fillmore sold 19,174 shares of Company common stock for proceeds of about $1.8 million on April 13, 2021. Just afterwards, on April 23, 2021, Defendant Schultz sold 30,000 shares of Company common stock for proceeds of about $2.8 million. Just three days later, on April 26, 2020, Defendant Schultz sold another 30,000 shares of Company common stock for proceeds of about $2.9 million. Not only did these sales just after the Company made false and misleading statements that artificially inflated the price of the Company's common stock, they also occurred just before the Company made more false and misleading statements which would artificially inflate the price of the Company's common stock, in the May 3, 2021 press release.

148.    The timing and amounts of these insider sales, made while the price of the Company's common stock was artificially inflated, further demonstrate that the Individual Defendants, including those who served on the Board, knew of the falsity of the statements made and that those Individual Defendants who made insider sales were using this knowledge to enrich themselves while the Company's common stock remained inflated.

## **DAMAGES TO CHEGG**

149.    As a direct and proximate result of the Individual Defendants' misconduct, Chegg has lost and expended, and will lose and expend, many millions of dollars.

150.   Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and six of the Individual Defendants, legal fees associated with the Pearson Action filed against the Company, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

151.   Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the Cheating Misconduct and the Copyright Infringement Misconduct.

152.   Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

153.   As a direct and proximate result of the Individual Defendants' conduct, Chegg has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## **DERIVATIVE ALLEGATIONS**

154.   Plaintiff brings this action derivatively and for the benefit of Chegg to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Chegg, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

155.   Chegg is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

156.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Chegg. Plaintiff will adequately and fairly represent the interests of Chegg in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

157.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

158.    A pre-suit demand on the Board of Chegg is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan and York (collectively, the "Director-Defendants"), and non-party Marcela Martin (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of ten Directors that were on the Board at the time this action was commenced.

159.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause or permit the Company to engage in the Cheating Misconduct and the Copyright Infringement Misconduct and to make and/or cause the Company to make false and misleading statements and omissions of material facts. Furthermore, while the price of the Company's common stock was artificially inflated by their misconduct, the Director-Defendants further breached their fiduciary duties by causing the Company to initiate a secondary public offering which enriched Defendant Rosensweig while subjecting the Company to liability for violations of the Exchange Act. In yet further breach, three of them engaged in insider sales at these artificially inflated prices for a collective $54.5 million in proceeds, demonstrating their motive for facilitating and participating in the fraud. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

160.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing or permitting the Company to engage in the Cheating Misconduct and the Copyright Infringement Misconduct and making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

161.   Additional reasons that demand on Defendant Rosensweig is futile follow. Defendant Rosensweig has served as the Company's CEO and President since February 2010, as Chairperson of the Board from March 2010 to July 2018, and as Co-Chairperson of the Board since July 2018. As such, the Company provides Defendant Rosensweig with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As CEO and Co-Chairperson throughout the Relevant Period, Defendant Rosensweig was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company, including, *inter alia*, those contained in the press releases, cited above, wherein he personally made the false and misleading statements at issue. In addition, he solicited the 2021 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders approving, on an advisory basis, his unjust compensation. As the Company's highest officer and as a trusted Co-Chairperson, he conducted little, if any, oversight of the Company's engagement in the schemes to engage in the Cheating Misconduct, the Copyright Infringement Misconduct, and to make false and misleading statements; consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, many of which coincided with him and the Company making false and misleading statements, yielded approximately $48.8

million in proceeds and demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Rosensweig is a defendant in the Securities Class Action. For these reasons, too, Defendant Rosensweig breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

162.    Additional reasons that demand on Defendant Sarnoff is futile follow. Defendant Sarnoff has served as Co-Chairperson of the Board since July 2018 and as a Company director since August 2012. He is also a member of the Audit Committee. As Co-Chairperson, he receives substantial compensation. In addition, Defendant Sarnoff solicited the 2021 Proxy Statement, which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. As the Company's trusted Co-Chairperson, he conducted little, if any, oversight of the Company's engagement in the schemes to engage in the Cheating Misconduct, the Copyright Infringement Misconduct, and to make false and misleading statements; consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded his duties to protect corporate assets. His insider sale before the fraud was exposed, which coincided with the Company making false and misleading statements, yielded approximately $4.3 million in proceeds and demonstrates his motive in facilitating and participating in the fraud. Furthermore, Defendant Sarnoff is a defendant in the Securities Class Action.[5] For these reasons, too, Defendant Sarnoff breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

163.    Additional reasons that demand on Defendant Bond is futile follow. Defendant Bond has served as a Company director since December 2020, and she is a member of the Compensation Committee. Defendant Bond has received and continues to

---

[5] As mentioned above, Defendant Sarnoff is named as a defendant in the Securities Class Action complaint's "Parties" section, though he is omitted from the complaint's caption.

receive significant compensation for her role as a director. In addition, she solicited the 2021 Proxy Statement, which contained false and misleading elements that benefitted the other Individual Defendants. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the schemes to engage in the Cheating Misconduct, the Copyright Infringement Misconduct, and to make false and misleading statements; consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Bond breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

164.  Additional reasons that demand on Defendant Budig is futile follow. Defendant Budig has served as a Company director since November 2015. She also serves as Chair of the Audit Committee. Defendant Budig has received and continues to receive significant compensation for her role as a director. In addition, she solicited the 2021 Proxy Statement, which contained false and misleading elements that benefitted the other Individual Defendants. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the schemes to engage in the Cheating Misconduct, the Copyright Infringement Misconduct, and to make false and misleading statements; consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Budig breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

165.  Additional reasons that demand on Defendant LeBlanc is futile follow. Defendant LeBlanc has served as a Company director since July 2019, and he is a member of the Governance and Sustainability Committee. Defendant LeBlanc has received and continues to receive significant compensation for his role as a director. In addition, he

solicited the 2021 Proxy Statement, which contained false and misleading elements that, *inter alia*, contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to engage in the Cheating Misconduct, the Copyright Infringement Misconduct, and to make false and misleading statements; consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant LeBlanc breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166.    Additional reasons that demand on Defendant Levine is futile follow. Defendant Levine has served as a Company director since May 2013. She also serves as Chair of the Governance and Sustainability Committee and as a member of the Compensation Committee. Defendant Levine has received and continues to receive significant compensation for her role as a director. In addition, she solicited the 2021 Proxy Statement, which contained false and misleading elements that, *inter alia*, contributed to her reelection to the Board. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to engage in the Cheating Misconduct, the Copyright Infringement Misconduct, and to make false and misleading statements; consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme; and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Levine breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

167.    Additional reasons that demand on Defendant Schlein is futile follow. Defendant Schlein has served as a Company director since December 2008, and he is a member of both the Governance and Sustainability Committee and the Audit Committee. Defendant Schlein has received and continues to receive significant compensation for his

role as a director. In addition, he solicited the 2021 Proxy Statement, which contained false and misleading elements that benefitted the other Individual Defendants. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to engage in the Cheating Misconduct, the Copyright Infringement Misconduct, and to make false and misleading statements; consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Schlein breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168.   Additional reasons that demand on Defendant Whelan is futile follow. Defendant Whelan has served as a Company director since June 2019. She also serves as a member of the Compensation Committee. Defendant Whelan has received and continues to receive significant compensation for her role as a director. In addition, she solicited the 2021 Proxy Statement, which contained false and misleading elements that benefitted the other Individual Defendants. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the schemes to engage in the Cheating Misconduct, the Copyright Infringement Misconduct, and to make false and misleading statements; consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Whelan breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

169.   Additional reasons that demand on Defendant York is futile follow. Defendant York has served as a Company director since June 2013, and he is Chair of the Compensation Committee and a member of the Governance and Sustainability Committee. Defendant York has received and continues to receive significant compensation for his role

as a director. In addition, he solicited the 2021 Proxy Statement, which contained false and misleading elements that benefitted the other Individual Defendants. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to engage in the Cheating Misconduct, the Copyright Infringement Misconduct, and to make false and misleading statements; consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded approximately $1.4 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant York breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

170.    Additional reasons that demand on the Board is futile follow.

171.    Moreover, as described above, Defendants Rosensweig, Sarnoff, and York directly engaged in insider trading, in violation of federal law. While in possession of material non-public information, Defendants Rosensweig, Sarnoff, and York collectively received proceeds in excess of $54.5 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Defendant Rosensweig and Sarnoff, in particular, engaged in insider sales that seemingly coincided with the Company making false and misleading statements. Therefore, demand in this case is futile as to them, and further excused.

172.    Further still, Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan and York approved the Company's February 2021 secondary offering of its common stock to investors at prices artificially inflated by their own misconduct, enriching Defendant Rosensweig by $29,865,600 at the expense of making the Company violate the Exchange Act. This breach of fiduciary duties has subjected the Company, and

certain of the Individual Defendants, to a substantial likelihood of liability in the Securities Class Action. Therefore, demand in this case is futile as to them, and further excused.

173.   Additionally, the Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. Defendants Rosensweig, Brown, Schultz, Fillmore, and Sarnoff have worked at the Company together for approximately a decade, with Schultz—with the longest tenure—having joined in 2008, and Fillmore—the last of the five to join—having joined in 2013. Moreover, Defendants Bond and Levine were MBA students together at Harvard Business School in 2005. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question each other's and the remaining Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

174.   Defendants Budig (as Chair), Sarnoff, and Schultz (collectively, the "Audit Committee Defendants"), served on the Company's Audit Committee during the Relevant Period. The Audit Committee Defendants violated the Audit Committee Charter by engaging in or permitting the scheme to cause the Company to engage in the Cheating Misconduct and the Copyright Infringement Misconduct, to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition the Audit Committee Defendants violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company'

allowing them to continue or being breaching their fiduciary duties to the Company and (2) approve, via non-binding advisory vote, the compensation of the Company's named executive officers, including Defendants Rosensweig, Brown, Schultz, and Fillmore, who were breaching their fiduciary duties to the Company.

189.   The Company was damaged as a result of Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan and York's material misrepresentations and omissions in the 2021 Proxy Statement.

190.   Plaintiff on behalf of Chegg has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

191.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

192.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Chegg's business and affairs.

193.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

194.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Chegg.

195.   In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the Cheating Misconduct and the Copyright Infringement Misconduct.

196.   In further breach of their fiduciary duties owed to Chegg, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that:

disclosure controls and procedures. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

175.   In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to engage in the Cheating Misconduct and the Copyright Infringement Misconduct, to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, supporting and profiting from unethical academic behavior, failing to avoid conflicts of interest, failing to respect the intellectual property rights of others, engaging in insider trading, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

176.   Chegg has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Director-Defendants or any others who were responsible for that wrongful conduct to attempt to recover for Chegg any part of the damages Chegg suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

177.   The acts complained of herein constitute violations of fiduciary duties owed by Chegg's officers and directors, and these acts are incapable of ratification.

178.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Chegg. If

there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Chegg, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

179.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants, and if not all at least a majority of the Directors, face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

180.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Chegg to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

181.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with

disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan and York for Violations of Section 14(a) of the Exchange Act

182.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

183.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

184.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

185.   Under the direction and watch of the Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan and York, the 2021 Proxy Statement failed to disclose that: (1) Chegg was engaged in the Cheating Misconduct and the Copyright Infringement Misconduct; (2) Chegg's facilitation of cheating made easier by remote learning caused the Company to experience an increase in subscribers and revenue, rather than the factors the Company publicly represented; (3) as such, once in-person learning returned, the Company would not continue to enjoy a surge in subscriptions and revenue;

(4) due to the foregoing, the Company overstated its potential for growth throughout the Relevant Period; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

186.   Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan and York also caused the 2021 Proxy Statement to be false and misleading by failing to disclose that: (1) though the Company claimed that, in awarding performance-based compensation, it used certain metrics to ensure Chegg's "executive officers are incentivized in accordance with the long-term interests of our stockholders[,]" the selected metrics actually rewarded the Company's officers for a short-term increase in revenue caused by a combination of the Covid-19 pandemic and the Cheating Misconduct, and that these metrics would meaningfully decline once widespread remote learning ended; (2) though the Company claimed its directors and officers adhered to the Code of Conduct and that it would disclose waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed; and (3) the Board's, and its committees', risk oversight functions were not properly being exercised, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board.

187.   In the exercise of reasonable care, Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan and York should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2021 Proxy Statement, including but not limited to, the election of directors.

188.   The false and misleading elements of the 2021 Proxy Statement, led Company shareholders to, *inter alia*: (1) elect Defendants LeBlanc, Levine, and Sarnoff to the Board,

(1) Chegg was engaged in the Cheating Misconduct and the Copyright Infringement Misconduct; (2) Chegg's facilitation of cheating made easier by remote learning caused the Company to experience an increase in subscribers and revenue, rather than the factors the Company publicly represented; (3) as such, once in-person learning returned, the Company would not continue to enjoy a surge in subscriptions and revenue; (4) due to the foregoing, the Company overstated its potential for growth throughout the Relevant Period; and (5) the Company failed to maintain internal controls. As a result of the foregoing, Chegg's public statements were materially false and misleading at all relevant times.

197.   The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

198.   Also in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

199.   In yet further breach of their fiduciary duties, during the Relevant Period, six of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $91.8 million, while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

200.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were

committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

201. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the Cheating Misconduct and the Copyright Infringement Misconduct and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the Cheating Misconduct and the Copyright Infringement Misconduct, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the Cheating Misconduct and the Copyright Infringement Misconduct and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

202. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

203. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Chegg has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

204. Plaintiff on behalf of Chegg has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

205. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

206.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Chegg.

207.   The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Chegg that was tied to the performance or artificially inflated valuation of Chegg, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

208.   Plaintiff, as a shareholder and representative of Chegg, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

209.   Plaintiff on behalf of Chegg has no adequate remedy at law.

## <u>FOURTH CLAIM</u>

### Against the Individual Defendants for Abuse of Control

210.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

211.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Chegg, for which they are legally responsible.

212.   As a direct and proximate result of the Individual Defendants' abuse of control, Chegg has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

213.   Plaintiff on behalf of Chegg has no adequate remedy at law.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## FIFTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

214.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

215.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Chegg in a manner consistent with the operations of a publicly-held corporation.

216.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Chegg has sustained and will continue to sustain significant damages.

217.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

218.   Plaintiff on behalf of Chegg has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

219.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

220.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action and the Pearson Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

221.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

222.   Plaintiff on behalf of Chegg has no adequate remedy at law.

Verified Shareholder Derivative Complaint

## SEVENTH CLAIM

**Against Defendants Rosensweig, Brown, Schultz, Fillmore, Tomasello, and Sarnoff for Contribution Under Sections 10(b) and 21D of the Exchange Act**

223.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

224.   Chegg, along with Defendants Rosensweig, Brown, Schultz, Fillmore, Tomasello, and Sarnoff, are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Rosensweig's, Brown's, Schultz's, Fillmore's, Tomasello's, and Sarnoff's willful and/or reckless violations of their obligations as officers and/or director of Chegg.

225.   Defendants Rosensweig, Brown, Schultz, Fillmore, Tomasello, and Sarnoff, because of their positions of control and authority as officers and/or director of Chegg, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Chegg, including the wrongful acts complained of herein and in the Securities Class Action.

226.   Accordingly, Defendants Rosensweig, Brown, Schultz, Fillmore, Tomasello, and Sarnoff are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

227.   As such, Chegg is entitled to receive all appropriate contribution or indemnification from Defendants Rosensweig, Brown, Schultz, Fillmore, Tomasello, and Sarnoff.

## PRAYER FOR RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)  Declaring that Plaintiff may maintain this action on behalf of Chegg, and that Plaintiff is an adequate representative of the Company;

(b)  Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Chegg;

(c)  Determining and awarding to Chegg the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)  Directing Chegg and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Chegg and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Chegg to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)  Awarding Chegg restitution from the Individual Defendants, and each of them;

(f)  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

Verified Shareholder Derivative Complaint

      (g)    Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: January 12, 2022          Respectfully submitted,

                            **THE BROWN LAW FIRM, P.C.**
                            */s/ Robert C. Moest*
                            Robert C. Moest, Of Counsel, SBN 62166
                            2530 Wilshire Boulevard, Second Floor
                            Santa Monica, California 90403
                            Telephone: (310) 915-6628
                            Facsimile: (310) 915-9897
                            Email: RMoest@aol.com

                            **THE BROWN LAW FIRM, P.C.**
                            Timothy Brown
                            767 Third Avenue, Suite 2501
                            New York, NY 10017
                            Telephone: (516) 922-5427
                            Facsimile: (516) 344-6204
                            Email: tbrown@thebrownlawfirm.net

                            *Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## VERIFICATION

I,       Rak Joon Choi       a                plaintiff      in       the   within          action.
I   have   reviewed   the   allegations   made   in   this   shareholder   derivative
complaint,   know   the   contents   thereof,   and   authorize   its   filing.   To   those
allegations   of which   I   have   personal   knowledge,   I   believe   those   allegations   to
be   true.   As to   those   allegations   of   which   I   do   not   have   personal   knowledge,   I
rely   upon   my counsel and their investigation and believe them to be true.

I declare under penal~~~~~ '' ' 'he foregoing is true and correct.  Executed this _th
day of_____, 2022.

1/12/2022

*Rak Joon Choi*

AC7A14597FD8404...

Rak Joon Choi